IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

UNITED STATES OF AMERICA          )
                                  )
v.                                )     CASE NO. 2:24-CR-118-ECM-KFP
                                  )
WAYLON BLAKE GILREATH, SR.        )

## RECOMMENDATION OF THE MAGISTRATE JUDGE

Before the Court is Defendant Waylon Blake Gilreath's Motion to Suppress and supporting briefs. Docs. 40, 70. The Government opposes the motion. Doc. 52. The Court held a hearing on the motion on June 26–27, 2024. Upon consideration of the testimony presented at the hearing, the evidentiary submissions, and the parties' arguments, the undersigned recommends the motion be DENIED for the reasons below.

## I.   FACTS

### A.  Events at the Residence

On March 20, 2024, law enforcement was called to a domestic issue at 125 Katie Lane, the home of Andrea Gilreath. Doc. 79 at 25:15–19; 104:19–105:11. Upon arrival, Montgomery County Sheriff's deputies found Defendant outside the home on the front porch. Doc. 79 at 105:5–22. When Deputy Skylar Campbell arrived, it was about 12:46 a.m.; he was not the first on the scene but arrived soon after the first officers. *See* Gov't Ex. 2A at 04:46; Doc. 79 at 105:23–25. Defendant advised the deputies that he had a firearm in his waistband, and he cooperated with law enforcement's request to take possession of it. Doc. 79 at 106:3–107:5. When Sergeant Roy Foster, the night shift supervisor, arrived a few minutes later around 12:49 a.m., Defendant was still standing on

the porch talking with the other officers. Doc. 79 at 6:9–22; Gov't Ex. 1A at 1:19. Foster engaged Defendant about the circumstances of the call, and Defendant told him, "This is my house and I'm trying to get in. My son's in there." Gov't Ex. 1A at 1:35–1:41. When Foster asked Defendant why law enforcement had been called out, Defendant said he did not know. Gov't Ex. 1A at 1:38–1:48. During the discussion, Defendant acknowledged that law enforcement had been called out previously for domestic issues. Defendant confirmed that he and his wife, the occupant of the home, were separated but not yet divorced and that Defendant now lived in Georgia. At the same time, Defendant told Foster he planned to move back into the home. Doc. 79 at 100:12–101:1; 106:3–22; Gov't Ex. 1A 1:54–2:28.

At 12:53 a.m., Foster went inside the home where Deputy Hart was already inside speaking with Andrea Gilreath, Defendant's estranged spouse. Gov't Ex. 1A at 5:40–7:14. Ms. Gilreath explained that she and Defendant were going through a difficult divorce. Defendant had moved out in May (2023), and she and their six-year-old now lived in the home. *Id*. She and Defendant shared custody of their six-year-old son, and until June, they followed an every-weekend visitation schedule. *Id*. She would meet Defendant in Auburn to drop off their son for his weekend visit. *Id*. On June 25, Defendant did not return their son to her from the weekend visit. Later, on June 28, she filed for emergency custody and divorce. According to Ms. Gilreath, sometime in August she was awarded custody of their son after Defendant failed to appear for a court hearing. *Id*. In response to Foster's request to see paperwork about their proceedings, Ms. Gilreath retrieved a file and pulled from it a document she described as her "protection order." Gov't Ex. 1A at 7:16–9:16; Doc. 79 at 12:2–25; 29:8–30:9; DX 1.

The document showed that Judge Calvin L. Williams found that a "temporary order is necessary to prevent abuse" to enjoin the "the above-named Defendant . . . from threatening" abuse and to "restrain [him] from contact with the Plaintiff." DX 1.[1] The temporary protection from abuse order (PFA) also prohibited Defendant from going within 1000 feet of Ms. Gilreath's home. The front porch where he was found that evening was within 1000 feet of the home. Doc. 79 at 99:7–18. The judge signed the PFA on September 12, 2023, and the order set a hearing for October 17, 2023. DX 1; Doc. 79 at 32:4–9. Ms. Gilreath informed Foster that she did have an order of protection, but "Judge Williams dropped it because he has not been here in four months." Ms. Gilreath described to Foster that the order was lifted because visitation had to resume, and they had court on January 9. Gov't Ex. 1A at 9:16–9:36; Tr. 28:5–10; 28:22–24. Deputy Hart commented, "So now, it is not in effect?"; Ms. Gilreath responded, "Correct." Gov't Ex. 1A at 9:34–9:37. Deputy Hart suggested to Ms. Gilreath that she should work on getting a new one in place. *Id.* at 9:38–46.

Meanwhile, outside the home Deputy Campbell kept talking with Defendant. Doc. 79 at 107:6–108:2. During their discussions, Defendant relayed that Ms. Gilreath had a protection from abuse order that was "fake," and the order had been dismissed. Gov't Ex.

---

[1] Foster acknowledged on cross-examination that the protection from abuse order he reviewed, Defendant's Exhibit 1, has errors on it. For example, it identifies Andrea Beverly Gilreath as both plaintiff and defendant, but it describes the named defendant by using identifiers that fit Defendant Waylon Blake Gilreath (*e.g.*, sex, M; height, 6'02; weight, 300; home in Williamson, Georgia). The typo in listing Ms. Gilreath as both plaintiff and defendant on the order did not prevent Foster from understanding that Ms. Gilreath was the plaintiff identified and that Defendant, Mr. Gilreath, was the intended named defendant who was enjoined. Doc. 79 at 30:10–31:7; 38:1–15; 96:2–19.

2A at 15:25–15:38. He informed Deputy Campbell that they have a visitation schedule where Defendant has custody of their son every other week. *Id*.

At about 1:01 a.m. after reading the order of protection document from Ms. Gilreath, Foster announced to Ms. Gilreath and Deputy Hart that he would find out if the order had been cancelled; if not, "we will hook him up." Gov't Ex. 1A at 12:46–12:52; Doc. 79 at 13:12–21; DX1. While reviewing the document, Foster commented that the protection from abuse order looked valid to him, and if dispatch confirmed it to be valid, Defendant would go to jail for violating it. Gov't Ex. 1A at 13:04–13:13; DX 1; Doc. 79 at 11:4–23; 13:12–21; DX 1. In response, Ms. Gilreath informed Foster that she "was told it was dropped." Gov't Ex. 1A at 13:12–13:14. Foster asked Ms. Gilreath if she received any paperwork as part of that information. Gov't Ex. 1A at 13:14–13:33. Ms. Gilreath informed him that she was sure the information was on the efile system. Gov't Ex. 1A at 13:33; Tr. 35:17–36:3. A few minutes later, Foster radioed dispatch about the validity of the protection from abuse order; dispatch responded, "10-4. According to AlaCourt it's still active." Gov't Ex. 1A at 17:22–35. Dispatch asked Foster whether he had the actual paperwork. Foster confirmed he had it, and dispatch again affirmed, "According to AlaCourt, it's in effect." Gov't Ex. 1A at 17:38–17:51; Doc. 79 at 13:12–21; 14:12–17; 16:17–22; 38:1–11. Foster did not ask dispatch to pull any paperwork or if there had been a final hearing or subsequent order. Doc. 79 at 40:22–41:9.

In response to the dispatch confirmation, Foster walked outside at about 1:06 a.m. and arrested Defendant for violating the protection from abuse order. Gov't Ex. 1A at 17:59–18:11; Doc. 79 at 26:22–25; 108:10–24. Foster began—but did not complete—the

*Miranda* warning, as Defendant protested emphatically that the order of protection was dismissed by Judge Williams. Gov't Ex. 1A at 18:07–19:05; Doc. 79 at 16:23–17:07. After Defendant was handcuffed, Foster returned inside the home to take a picture of the temporary protection from abuse order Ms. Gilreath showed him earlier. While inside, he asked if Ms. Gilreath wanted Defendant's truck towed. Before she could respond, Foster instructed her, "I would say yes." Then, without waiting for her to respond, Foster confirmed his plans to have the vehicle towed. Gov't Ex. 1A at 19:23–42; Doc. 79 at 75:14–76:18. Foster did not think it would be a good idea to leave the vehicle there. And pursuant to the arrest, it was policy to tow, so he ordered the deputies to do an inventory search before the vehicle was towed. Doc. 79 at 18:17–19:14. Ms. Gilreath asked Foster if he would like her to look through her court documents; Foster declined and confirmed to Ms. Gilreath that dispatch said the order of protection was active in the system. Gov't Ex. 1A at 20:55–21:03.

Outside the home, Defendant talked with other deputies, including Campbell, maintained his protestation that the PFA had been dismissed, and relayed to them that he had a document in his backpack that would prove the order had been dismissed. Doc. 79 at 110:4–111:8; Gov't Ex. 1A at 21:51–59; Gov't Ex. 2A at 25:25–26:30. The deputies walked Defendant over to his vehicle to retrieve his backpack and, with his permission and direction, began going through stacks of paperwork inside it. Gov't Ex. 2A at 27:00–28:45. At about 1:10 a.m. Foster approached the deputies who were going through the backpack with Defendant and again informed Defendant that dispatch confirmed the order was valid and that Defendant was under arrest for violating it. Gov't Ex. 1A at 21:45–22:52. Foster

then walked back to his own vehicle after he instructed the deputies to get the Defendant loaded up and taken in. *Id*. The deputies discontinued their search through Defendant's backpack, and one of them took Defendant away to be processed. Gov't Ex. 2A at 28:43–31:10. Given Defendant's arrest, Foster instructed the deputies to inventory the vehicle to secure the items of value before it was towed. Doc. 80 at 13:16–25; Doc. 79 at 17:23–18:20; 78:10–19; 79:16–22; 80:12–17; 81:5–12; 102:15–103:15; 111:9–112:3; DX 5, policy 7.03 at 1–2.

Before they began the inventory search on Defendant's vehicle, Deputy Campbell went back inside the home to talk with Ms. Gilreath. Gov't Ex. 2A at 31:48. She again asked about the validity of the protection from abuse order because she "was told that it was stopped" and that was why she had been allowing visitation. Gov't Ex. 2A at 31:48–55; 33:45–55; Doc. 79 at 114:23–115:7; Doc. 80 at 9:21–10:2; 10:20–11:10. Deputy Campbell wanted to make sure they were acting properly, so he walked out to Foster's vehicle near the driveway to confirm with him the validity of the order of protection. Gov't Ex. 2A at 34:45–52; Doc. 80 at 11:11–12:5. The computer system in Foster's patrol vehicle was not working, so he could not access AlaCourt to look it up. Doc. 79 at 23:8–11. Foster testified that while in his vehicle, he called dispatch (direct to the dispatcher's cellphone) from his cellphone to ask again about the PFA, and dispatch, a second time, confirmed it was active. Doc. 79 at 16:23–17:19; 22:10–20; 55:7–10; Doc. 80 at 13:8–10. His bodycam was off while he was inside the vehicle, but, just before getting into his vehicle, he can be seen on the bodycam holding his cellphone appearing to enter a number; for reasons unknown, the call is not on the catalog of calls coming into dispatch. Doc. 79 17:10–16;

22:10–16; 53:3–16; 54:13–55:20; Gov't Ex. 1A at 22:39–23:03; Doc. 80 at 13:8–15. Deputy Campbell relayed to Foster Ms. Gilreath's belief that the PFA was no longer active, but Foster responded that dispatch had told him it remained active and that he was relying on what dispatch reported to him. Gov't Ex. 2A at 34:46–59.

At about 1:29 a.m., Foster walked back toward the house, and he approached the deputies who were performing the inventory search on Defendant's truck in the driveway. Gov't Ex. 1B at 00:29–00:54. As he approached, a deputy pulled out a pill bottle. Foster responded, "What is that? Drugs?" Gov't Ex. 1B at 1:10–15. Foster used his flashlight to glance in the vehicle to see if he saw signs it was stolen, and he also ran the VIN number to confirm it was not. Gov't Ex. 1B at 1:38–50; Doc. 79 at 83:22–84:24. A few minutes later, Deputy Campbell pulled four pill bottles out of a crown royal bag and asked Foster if he could identify what they were; initially, Foster thought it looked like beads from a shotgun. Gov't Ex. 1B at 4:00–01; Doc. 79 at 86:1–8; Doc. 80 at 23:13–23; 25:5–21. But while giving one of the pill bottles a little shake, he commented, "Homemade explosive, maybe? I don't know." Then Foster noticed something more about the bottles: "It's got shrapnel" inside, and he exclaimed, "This is some terrorist shit or something." Gov't Ex. 1B at 4:01–4:21; Gov't Ex. 2A 14:55–15:38; Doc. 79 at 19:15–23; 20:11–21:12; 64:5–8; 86:1–22. Foster remarked to the deputies that he did not know if what was inside the pill bottles was illegal or not, but he "would think it was." Gov't Ex. 1B at 4:28–32; Doc. 80 at 25:5–21; 37:1–13; Doc. 79 at 86:14–18. Deputy Campbell thought they could be improvised explosive devices. Doc. 79 at 114:2–22; Doc. 80 at 36:8–25. Foster instructed the deputy to impound the four pill bottles along with the other items they had identified

inside the vehicle, including multiple firearms, ammunition, and body armor. *See* Doc. 79. at 19:24–8; 112:13–113:11; Doc. 80 at 26:3–8; Gov't Ex. 1B at 4:01–38. Once again, Foster confirmed that Defendant had been arrested based on his checking and confirming the PFA, and Foster reported to the deputies conducting the inventory that he (Foster) planned to sign the warrant on Defendant. Gov't Ex. 1B at 4:38–52. Foster returned to his vehicle and drove to the office to prepare the warrant. *See* Gov't Ex. 1B at 4:35–5:09.

Around 1:45 a.m., while Deputy Campbell was continuing the inventory search, Ms. Gilreath approached him outside and reported that she found an email from her attorney attaching an order vacating the PFA. Doc. 79 at 115:8–116:8; Gov't Ex. 2B at 27:25–28:28; Doc. 80 16:06–17:2. Confronted with this order, Deputy Campbell was concerned about proceeding, so he stopped the inventory search and called Foster. He shared the information with Foster. Doc. 79 at 115:08–116:21; Gov't Ex. 2B at 28:31–29:40; Doc. 80 at 18:4–15. Around 1:48 a.m., Ms. Gilreath forwarded the email to Deputy Campbell, and Deputy Campbell said he would forward it on to Foster. Gov't Ex. 2B at 30:14–31:00; Doc. 80 at 18:20–19:7.

At some point, Foster again reassured Deputy Campbell that dispatch said the protection from abuse order was valid, so Deputy Campbell resumed the inventory of Defendant's vehicle. Doc. 79 at 16:1–16; 116:22–117:3; Doc. 80 at 21:15–22:7. Deputy Campbell and others completed the inventory and transported the collected items to the Sheriff's Office for processing. Doc. 79 117:10–22. The pill bottles still concerned Deputy Campbell at that time because he was unsure what they were. Doc. 79 at 117:23–118:18.

Back at the office, Foster checked in with dispatch, who again told him the protective order was in effect. Doc. 79 at 14:20–15:9; 16:1–17:19; 66:23–67:10; Gov't Ex. 3. Dispatch did not provide the January 9 order—Foster testified that it was not in the system then but that he did not check himself; he relied on dispatch. Doc. 79 51:23–52:8; 59:9–60:25; 73:1–7. A couple of hours after receiving the order from Deputy Campbell, around 3:30 a.m., Foster completed the arrest warrant. Doc. 79 at 71:8–24; 74:1–11; Gov't Ex. 3. When he prepared the warrant for the local magistrate's review and execution, he did not mention the order vacating the PFA. Doc. 79 at 74:1–75:10. The warrant was issued for violation of the protection order. Gov't Ex. 3; Doc. 79 at 73:8–14; 87:22–88:1.

### B.  Questioning of Defendant Following his Arrest

After the inventoried items from Defendant's vehicle were brought into the Sheriff's Office, Foster realized he needed to call someone about the pill bottles he earlier questioned as some kind of homemade bomb. Doc. 79 at 90:1–5; *see also* 118:6–120:6; Doc. 80 at 26:19–28:24. Foster testified he made a bad judgment call waiting until then to make that inquiry; he should have called in the tact or bomb personnel immediately. Doc. 79 at 86:3–87:19. By this time, Defendant had already been booked into the Montgomery County Jail, and it was nearing 4:00 a.m. Doc. 79 at 91:1–7. Foster realized he had brought inside the office something that was potentially unsafe—possibly a bomb. He called an investigator, Lieutenant Jeff Davis, and they determined it was critical to find out what was inside the pill bottles and what kind of public safety threat, if any, was posed by the contents. Doc. 79 at 91:1–94:8; Doc. 80 at 27:12–28:13. As a result, Foster directed Deputy Campbell to

9

ask Defendant what was inside the bottles. Doc. 79 at 95:5–14; 118:11–120:9; Doc. 80 at 28:17–24.

At around 3:57 a.m., Deputy Campbell went over to the Montgomery County Jail to speak with Defendant. Doc. 79 at 119:22–120:9; Doc. 80 at 29:13–23; 34:17–23. Defendant had already been booked for violating the protection from abuse order, and he was standing in an open jail cell near the booking area. *Id*. He was dressed in an orange jumpsuit. Gov't Ex. 2E at 00:35–1:10; Doc. 80 at 31:1–10; 32:19–24. He was in the cell with at least one other individual in an orange jumpsuit. *Id*. Defendant walked out of the open cell door to meet Deputy Campbell in the area in front of the booking desk. *Id.*; Doc. 80 at 29:13–23. Deputy Campbell was trying to urgently assess what was in the bottles. Doc. 79 at 119:22–121:5; Doc. 80 at 30:2–25. Without issuing a *Miranda* warning, Deputy Campbell asked him what was in the pill bottles, and Defendant relayed that the pill bottles contained Tannerite and pieces of glass. Gov't Ex. 2E at 00:35–1:10; Doc. 80 at 29:24–30:5. In response to Defendant's statement, Deputy Campbell informed him that having Tannerite in that condition was illegal and a "big federal charge . . . essentially a bomb." Gov't Ex. 2E at 00:35–1:10; Doc. 80 at 31:1–10; 32:19–24. The interaction lasted less than a minute, and at 3:58 a.m., Deputy Campbell started to walk back to the office to report his findings to Foster. The evidence was turned over to a bomb tech with the MPD bomb squad. Doc. 79 at 121:6–18; Doc. 80 at 33:8–11.

### C. The Protection from Abuse Order

According to his testimony, when Foster arrived back at the Sheriff's Office and confirmed a third time with dispatch the validity of the PFA, dispatch printed out for him something that looked like this:



Doc. 79 at 14:20–24; 16:1–12; 66:23–67:10; Gov't Ex. 3 at 1. The "Case Status" on the first page of the document reads "PROTECTIVE ORDER IN EFFECT."[2] According to Foster, this is the only part dispatch provided when he talked with them upon his return to the Sheriff's Office—after receiving dispatch's verification first by radio while inside Ms.

---

[2] Government's Exhibit 3, the certified copy of the AlaCourt printout, shows that it was prepared for the Government's counsel, Brandon Bates, on May 17, 2024, at 10:33 a.m. Thus, as of the time of the printing of this certified copy, the case status still (incorrectly) showed the protective order was "IN EFFECT." See Doc. 79 at 15:1–6.

Gilreath's home and again by cellphone when he called them from his vehicle outside the home. Doc. 79 at 16:23–17:19; 22:1–20; 32:19–33:5; Doc. 80 at 13:8–10.

On the AlaCourt pages that follow, which are also part of Government's Exhibit 3, the case action summary appears, and it includes a description that indicates an order was entered on January 9, 2024. Gov't Ex. 3 at 3–5. The image of that order is not shown on this certified copy, and according to Foster dispatch did not show him the case action summary or the order when he sought to verify the validity of the PFA. Doc. 79 at 17:10–22; 67:19–68:19; 70:9–71:4; 71:25–72:25. The January 9 order, which Ms. Gilreath provided to Deputy Campbell and Campbell forwarded to Foster, shows that the order of protection from abuse was, in fact, vacated.

DOCUMENT 30



IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA
DOMESTIC RELATIONS DIVISION

GILREATH ANDREA BEVERLY,　　)
Plaintiff,　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　)
V.　　　　　　　　　　　　　　)  Case No.:　　DR-2023-000597.00
　　　　　　　　　　　　　　　　)
GILREATH WAYLON BLAKE SR,　)
Defendant.　　　　　　　　　　　)

ORDER

THIS CAUSE comes before the Court upon the Petition for Protection from Abuse filed by the Plaintiff.

On the date of the hearing there appeared the Plaintiff with her attorney, the Honorable Chip Cleveland, and the Defendant appeared with his attorney, the Honorable Jamie Ratliff.

Upon consideration of the testimony and exhibits ore tenus, it is hereby ORDERED as follows:

　　1.　　That said Petition for Protection from Abuse is DENIED due to insufficient evidence of abuse as required under the Statute.

　　2.　　The Ex Parte Order of Protection is VACATED.

　　3.　　That a copy of this Order be transmitted to the parties and or counsel.

DONE this 9th day of January, 2024.

　　　　　　　　　　　　　　　　/s/ CALVIN L WILLIAMS
　　　　　　　　　　　　　　　　CIRCUIT JUDGE

DX 6. Foster testified that on March 20, the computer in his vehicle was not working and he relied, as he regularly does, on dispatch to provide him with the necessary information from AlaCourt. Doc. 79 at 14:12–19; 32:19–33:1; 35:4–11; 43:6–9; 69:2–10; 69:25–70:5; 71:25–72:13. Deputy Campbell sent this document to Foster, but dispatch did not pull it up in the system. Doc. 79 at 70:9–71:4. According to Foster, it was not in the system when

13

dispatch looked, and Foster relied on dispatch to tell him what was in the system. He relied on them when they informed him the PFA was in effect. Doc. 79 at 71:25–72:13; 72:20–25; 73:1–7. According to Foster, he will "go by what's in the system. [And] can't arrest nobody unless it's in the system." Doc. 79 at 72:12–13.

## II.   DISCUSSION

Defendant argues that law enforcement lacked probable cause to arrest him on March 20, 2024. Defendant contends that a reasonable officer would have waited to obtain the relevant court document rather than relying on the dispatcher's verbal confirmation. If probable cause did exist, Defendant argues that it evaporated once law enforcement received a copy of the order vacating the protection from abuse. He argues the inventory search should have ceased, and he should have been released at that time. The inventory search, Defendant argues, was an illegal investigatory search. Next, Defendant argues that his statement to Deputy Campbell while he was detained at the Montgomery County Detention Facility must be suppressed because it was taken without first issuing him a *Miranda* warning. Finally, he asserts that a subsequent custodial interview by ATF should be suppressed as fruit of the poisonous tree resulting from his illegal arrest and illegal search of his vehicle.

In response, the Government argues that probable cause supported Defendant's arrest based on Sergeant Foster's good-faith reliance on the dispatcher and that law enforcement had recovered the four destructive devices from Defendant's vehicle by the time Judge Williams's order vacating the PFA was received. The Government argues this intervening discovery yielded new probable cause supporting the arrest. According to the

Government, the search was a sound inventory search pursuant to Defendant's arrest. The Government contends that no *Miranda* warning was required when Deputy Campbell questioned Defendant because it was not a custodial interrogation, and the subsequent *Mirandized* statement could not be suppressed as fruit of the poisonous tree even if there were a basis to find custodial interrogation because the statement was taken under exigent circumstances so it should not be suppressed. Finally, the Government argues there were no fruits of a poisonous tree tainting the ATF interview and, even if some part of the preceding events were infirm, the interview was too attenuated from any of these events to support exclusion based on them.

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." The exclusionary rule—suppressing evidence obtained in violation of the Fourth Amendment—is not itself a constitutional guarantee. The rule is one of deterrence, not reparation. *See e.g.*, *United States v. Calandra*, 414 U.S. 338, 347–48 (1974) ("The purpose of the exclusionary rule is not to redress the injury to the privacy of the search victim . . . . Instead, the rule's prime purpose is to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures[.] The rule is calculated to prevent, not to repair.") (internal quotation and citation omitted). There are several exceptions to the exclusionary rule, including the good-faith exception. *United States v. Leon*, 468 U.S. 897 (1984). For example, "[w]hen police act under a warrant that is invalid for lack of probable cause, the exclusionary rule does not apply if the police acted 'in objectively reasonable

reliance' on the subsequently invalidated search warrant.'" *Herring v. United States*, 555 U.S. 135, 142 (2009) (quoting *Leon*).

## A. Probable Cause for Arrest

The Government argues the good-faith exception applies and that this case is similar to *Arizona v. Evans*, 514 U.S. 1 (1995), where the exception was applied to an arrest made on a mistaken warrant. In *Evans*, a police officer stopped a driver for traveling the wrong way on a one-way street, and during the stop the officer learned that the driver's license was suspended and that he had an outstanding misdemeanor arrest warrant. *Id*. at 4. While the officer was putting the driver in custody, the driver dropped a hand-rolled cigarette, and the officer smelled marijuana. *Id*. A subsequent search revealed a bag of marijuana, and the driver was charged with possession. *Id*. After the arrest, the officer learned that the arrest warrant had been quashed days earlier. *Id*. The driver sought to suppress the marijuana as the fruit of the unlawful arrest, and the state argued the good-faith exception applied. *Id*.

The chief clerk of the justice court testified that the applicable standard procedure was for the justice court clerk to call the warrant section of the Sheriff's Office when a warrant was quashed, and then the Sheriff's Office would remove the warrant from its computer records. *Id*. at 5. After making that call, the clerk was to make a note in the individual's file. *Id*. The chief clerk testified that there was no file note indicating the call to the Sheriff's Office had been made this time, and the Sheriff's Office had no record of a call regarding quashing the warrant. *Id*. The trial court granted the motion to suppress, the Arizona Court of Appeals reversed, and that holding was reversed by the Arizona Supreme Court. The state supreme court held that application of the exclusionary rule was warranted

and would "improve the efficiency of those who keep records in our criminal justice system," registering that court's disagreement with the lower court that the deterrence purpose of the rule "would not be served where carelessness by a court clerk results in an unlawful arrest." *Id*. at 5–6.

Thus, the Supreme Court set out to decide "whether the exclusionary rule requires suppression of evidence seized incident to an arrest resulting from an inaccurate computer record" where court personnel were responsible for the record's continued presence in the police computer system. *Id*. at 6. In answering this question, the Supreme Court noted that the exclusionary rule is rooted in deterring police misconduct, not court employee mistakes. *Id*. at 15. The Supreme Court found that exclusion of evidence where court employees were responsible for the erroneous computer record would not sufficiently deter future errors to warrant the severe sanction of exclusion; based on court personnel testimony, these types of errors occurred only once every three or four years. *Id*. at 14–15. "Because court clerks are not adjuncts to the law enforcement team engaged in the often competitive enterprise of ferreting out crime[,] they have no stake in the outcome of particular criminal prosecutions." *Id. at 15* (citation omitted). "If it were indeed a court clerk who was responsible for the erroneous entry on the police computer, application of the exclusionary rule also could not be expected to alter the behavior of the arresting officer." *Id*. Additionally, once the court clerks discovered the error, they cured it. *Id*. The Court held "[t]here is no indication that the arresting officer was not acting objectively reasonably when he relied upon the police computer record. Application of the *Leon* [good-

faith rule] supports a categorical exception to the exclusionary rule for clerical errors of court employees." *Id*. at 15–16 (citations omitted).

Similarly, the Government relies on *Herring*, which applied *Evans* to a police department employee's mistake. There, the Supreme Court considered whether the exclusionary rule applies when "an officer reasonably believes there is an outstanding arrest warrant, but that belief turns out to be wrong because of a negligent bookkeeping error by another police employee[.]" *Herring*, 555 U.S. at 137. An investigator for the Coffee County Sheriff's department saw Herring and asked the warrant clerk to check the county database for any outstanding warrants. *Id*. The database showed no Coffee County active warrants for Herring. *Id*. The investigator asked the warrant clerk to then check with the neighboring Dale County. *Id*. Dale County reported their database showed an active warrant for Herring's failure to appear on a felony charge. *Id*. Once that information was relayed to the investigator, but before a copy of the warrant had been retrieved and faxed over, the Coffee County investigator pulled Herring over and arrested him under the Dale County warrant. *Id*. When searching Herring and his truck, the investigator discovered narcotics in his pocket and a pistol under the front seat of his truck; Herring was already a prohibited person as a felon. *Id*. While the arrest took place, the Dale County warrant clerk could not locate a copy of the actual warrant for Herring, so she contacted the Dale County clerk's office and was informed that the warrant had previously been recalled. *Id*. at 137–38. The Dale County warrant clerk immediately contacted the Coffee County warrant clerk to relay this information, but Herring had already been arrested and searched. *Id*. This all occurred within just ten to 15 minutes. *Id*. Typically, when a warrant is recalled, the court

clerk's office or a judge's chambers calls the Dale County warrant clerk, who enters the information in the Sheriff's database and disposes of the physical copy. For reasons unknown, this time, the information about the recall of the warrant for Herring did not appear in the database. *Id*. at 138. Herring, who was indicted for possession of methamphetamine and felony possession of a firearm, moved to suppress the evidence. *Id*. The motion to suppress was denied by the district court. *Id*. at 1215. The Eleventh Circuit affirmed, finding the conduct was negligent, not deliberate or tactical—someone in the Dale County Sheriff's department negligently failed to note in the database that Herring's arrest warrant had been recalled. *Id*. at 138–39. Application of the exclusionary rule to those circumstances would be "marginal or nonexistent." *Id*. at 139.

The Supreme Court agreed. "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system. As laid out in our cases, the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence. The error in this case does not rise to that level." *Herring*, 555 U.S. at 144.

> The extent to which the exclusionary rule is justified by these deterrence principles varies with the culpability of the law enforcement conduct. As we said in *Leon*, "an assessment of the flagrancy of the police misconduct constitutes an important step in the calculus" of applying the exclusionary rule. [*Leon*,] 468 U.S., at 911, 104 S.Ct. 3405. Similarly, in [*Illinois v.*] *Krull*[, 480 U.S. 340, 107 S.Ct. 1160 (1987),] we elaborated that "evidence should be suppressed 'only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment.'" 480 U.S., at 348–349, 107 S.Ct. 1160 (quoting *United States v. Peltier*, 422 U.S. 531, 542, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975)).

*Id*. at 143.

The fact that the error—someone in Dale County failed to update the Sheriff's database—was negligent, and not reckless or deliberate, was crucial to the Court's holding that the sanction of exclusion should not apply. *Id*. at 141; 144.

This case is an *Evans* and *Herring* sandwich. Here, a mistake was made by unknown court (or AlaCourt) personnel, as in *Evans*. Next, that mistake was exacerbated by police dispatch personnel relying on the erroneous "IN EFFECT" status (and not pulling the last order, which vacated the PFA), similar to *Herring*. And, then that two-times erroneous information was relied upon by an officer in the field. Defendant tries to distinguish *Evans* and *Herring* by arguing the reasoning of those cases applied in different times—this is 2024, and courts, law enforcement, and dispatchers have access to electronic records at their fingertips. According to Defendant, this at-your-fingertips electronic access makes the mistake more egregious and more than negligent. Mistakes by someone like a dispatcher or a sergeant, like Foster, who did not or could not access AlaCourt to pull a copy of the January 9 order, according to Defendant, fall outside what should be immune from exclusion as good faith.

At the time of Defendant's arrest, law enforcement had a man who was unwelcomed, lawfully armed, and outside his estranged spouse's home. He was expressing his intent to be back in the home in the darkness of the morning after midnight. Law enforcement had a temporary order for protection from abuse in hand that appeared valid. The arrest was initiated when dispatch, by radio, confirmed the PFA was showing in the AlaCourt system as valid. Certainly, law enforcement encountered questions about the PFA

from the start—Ms. Gilreath believed that the PFA had been vacated, but Foster later received dispatch's confirmation that the PFA was showing as valid in the AlaCourt system. He did not need to take Ms. Gilreath's word as to its effectiveness. When Foster was confronted next with Defendant's similar—but more vocal—expression of his belief that the PFA was no longer valid, Foster acted reasonably faced with those circumstances and, again, asked dispatch, this time by telephone, to confirm whether the protection from abuse order was showing as valid in the system.

Foster did not have access in his vehicle to AlaCourt, so the only option available at the time of his decision to arrest Defendant and in the minutes later was to contact dispatch and ask whether the PFA remained valid. Those actions were reasonable under *these* circumstances. To the extent that the information relayed back to him by dispatch was wrong, his actions relying on that information at that time were not unreasonable. Indeed, there is no dispute that the case status mistakenly showed the PFA was "IN EFFECT." Like the officers' actions in *Evans* and *Herring*, Foster acted on information provided to him from people pulling it from a source believed to be trustworthy. Could Foster have taken his inquiry further? Could he have specifically asked dispatch, based on the information Mr. and Mrs. Gilreath had shared, "Dispatch, can you look into the case action documents and click on everything to pull it up; tell me if there is an order on January 9 after a hearing that dismisses the protection from abuse order?" Sure, he could have and perhaps a more meticulous officer would have done so. But under the totality of these circumstances, Foster's actions in twice contacting dispatch about the validity of the order from the field were reasonable under the law, and the information yielded enough to persuade a

reasonable officer that the PFA was valid, that Defendant had breached its proscriptions by coming within 1000 feet of Ms. Gilreath's house in the wee hour of the morning, and that an arrest for violating the PFA was warranted. As the *Herring* court held,

> To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system. As laid out in our cases, the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence. The error in this case does not rise to that level.

*Herring*, 555 U.S. at 144.

That dispatch provided erroneous information to Foster based on the system error showing the PFA status in AlaCourt was "IN EFFECT" under *Evans* and *Herring* will not support exclusion here. No one from dispatch testified at the suppression hearing. No one from the AlaCourt electronic filing system testified at the hearing. No one from the Montgomery County Circuit Court responsible for the PFA data testified at the hearing. Foster testified that he, per his usual practice, relied on dispatch. There is no dispute that the case status was shown as "IN EFFECT" in AlaCourt at that time (and even up to May 17, 2024). As noted in *Evans* and *Herring*, the historical design of exclusion for deterring police misconduct will not be served by imposing that sanction here where presumably a court or AlaCourt system employee made the originating mistake (e.g., erroneous entry or continuation of AlaCourt case status data entry "IN EFFECT" after the January 9 order). Additionally, although the dispatcher might be an adjunct of law enforcement, the mistake originated in the AlaCourt system. It was compounded by the dispatcher's reliance on the data entry mistake (e.g., using only the case status and not diving into the entire court record

to determine the PFA status[3]), and that erroneous information was relayed to and relied upon by a police officer in the field.[4] Given the reasonableness of law enforcement's actions at the point Defendant was taken into custody, his arrest, based on the inaccurate effectiveness of the PFA, will not support imposition of the exclusionary sanction. *Herring*, 555 U.S. at 146 ("We do not suggest that all recordkeeping errors by the police are immune from the exclusionary rule. In this case, however, the conduct at issue was not so objectively culpable as to require exclusion.").

## B. Inventory Search

"[I]nventory searches are now a well-defined exception to the warrant requirement of the Fourth Amendment." *Colorado v. Bertine*, 479 U.S. 367, 371 (1987) (citations omitted). The analysis of an inventory search centers not on probable cause but on "the reasonableness of routine administrative caretaking functions, particularly when no claim is made that the protective procedures are a subterfuge for criminal investigations." *Id.*; *S. Dakota v. Opperman*, 428 U.S. 364 (1976) (upholding an inventory search in an abandoned automobile impounded by the police finding the inventory procedures serve to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger). The Eleventh Circuit

---

[3] As noted, no one from AlaCourt or Circuit Court testified at the hearing. Thus, the record does not reflect the precise process or responsibilities of each entity with respect to data entry. And the record does not reflect the precise process dispatch typically follows. For example, how they access AlaCourt, what access they are granted, what they are able to see within the system, what they are able to retrieve from the system, if they lack any needed permissions for retrieval, etc.

[4] The Court takes judicial notice of the relevant documents in the state court record on the AlaCourt system, which demonstrate the case status has been corrected to reflect "DISPOSED." *See Gilreath v. Gilreath*, DR-2023-000597.00 (Montgomery County) (*available at*, https://v2.alacourt.com/frmCaseDetail.aspx?Code=rR91joDuqqke3%2fXl9s2pJw9G%2bYwSCHxPMAfXXfXC3PCJ6lZR2x7zcFKMHaDQdMPW).

has provided the framework for resolving whether law enforcement's decision to impound a vehicle was a valid exercise of police authority:

> Framed precisely, the critical question in cases such as this is not whether the police needed to impound the vehicle in some absolute sense, or could have effected an impoundment more solicitously, but whether the decision to impound and the method chosen for implementing that decision were, under all the circumstances, within the realm of reason.

*Sammons v. Taylor*, 967 F.2d 1533, 1543 (11th Cir. 1992) (citation omitted).

The inventory search of Defendant's vehicle began around 1:20 a.m. (Gov't Ex 2B), and it took place pursuant to Defendant's arrest. Given the domestic disturbance between the husband and wife, Foster determined that it would not be appropriate to leave the vehicle at Ms. Gilreath's home, and policy dictated that a vehicle towed pursuant to an arrest be inventoried first.

According to Foster, "If I take you to jail, I can't leave your vehicle there because if it gets stolen or broken into, we're responsible for it. . . . So I don't want nobody from the tow company stealing your items that are in your vehicle. So when I say tow the vehicle, inventory, anything of value that's right there readily easily to get to, you make sure you put it on paper so if it's missing, we didn't steal it." Doc. 79 at 18:1–20; *see also* 102:15–17; 111:9–112:6. The Montgomery County Sheriff's Office policy provides that when "any vehicle is taken into custody or control . . . [the] officer shall inventory the vehicle." DX 4 at § 7.030, p. 1; *see also* § 7.020, p. 4. The policy also provides that "[a]ny law enforcement officer of the Montgomery County Sheriff's Office will inventory and request a wrecker for towing purposes when taking control of a vehicle . . . .[w]henever the owner/operator of a vehicle is arrested." *Id*. at p. 2.

Although Defendant argues the search was investigatory and not inventory-based, Defendant has presented no evidence that Foster's motive for impounding the vehicle was anything more than an eagerness to do so. *See United States v. Williams*, 936 F.2d 1243, 1249 (11th Cir. 1991) (affirming the denial of defendant's suppression motion based on the inventory search doctrine where defendant "ha[d] not cited any pertinent authority suggesting that the officer did not have the legal right to impound the car"). While it is clear that Foster wanted to have the vehicle towed, there is no evidence before the Court suggesting that the inventory search was improperly motivated. *See United States v. Crawford*, 294 F. App'x. 466, 472 (11th Cir. 2008) (quoting *United States v. Bosby*, 675 F.2d 1174, 1179 (11th Cir. 1982)) ("'[T]he mere expectation of uncovering evidence will not vitiate an otherwise valid inventory search.'").

Under the facts and circumstances presented, the decision to impound Defendant's vehicle and the inventory search conducted on the vehicle was reasonable and did not violate Defendant's Fourth Amendment rights. The inventory search cannot be impugned under these circumstances, and the items discovered in the search cannot be suppressed on that basis.

### C.  Intervening Production of Order Vacating PFA

The totality of the circumstances of Defendant's arrest changed later in the morning when Ms. Gilreath produced the January 9, 2024 order from Judge Williams vacating the protection from abuse order. Faced with this order, it should have been clear to law enforcement that they were quite wrong in their earlier reliance on dispatch about the validity of the protection from abuse order. At the very least, confronted with this order, it

would have been reasonable to go back to dispatch and ask specifically about the January 9 order now that it was in hand. Indeed, Deputy Campbell reacted with concern about the arrest for violating the PFA when Ms. Gilreath confronted him with the order vacating it. He stated, "This changes a lot. . . . I've got to call my sergeant now because they have him under arrest . . . with no grounds." Gov't Ex. 2B at 28:17–28. But Foster did not specifically ask dispatch for the January 9 order when he arrived at the Sheriff's Office to again confirm the status; he relied on dispatch to simply affirm the effectiveness of the PFA. Doc. 79 at 60:12–16. If this was the point at which the arrest was made (and there were no other grounds for probable cause), then the exclusionary rule should apply to deter law enforcement from deliberately or recklessly disregarding a clear court order[5]—but, again, those were not the circumstances presented at the time of Defendant's arrest. *See Herring*, 555 U.S. at 144 (noting the exclusionary rule should be applied only to "deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence").

---

[5] Remarkably, Foster suggested only if the judge appeared with the order himself and Foster knew Judge Williams that he would have accepted the order over dispatch's confirmation as to the effectiveness of the PFA.

> Q.  So even if the order of protection from abuse was invalid, you weren't going to let him go.
>
> A.  No. That's incorrect.
>
> Q.  Okay.
>
> A.  If it was invalid and dispatch verified it was invalid, then I would have to let him go. That's the law.
>
>  . . .
>
> Q.  If Judge Williams drove up to the scene and showed you a piece of paper and said, I signed this order, would you still dig down and say, well, Alacourt says the dispatcher says—
>
> A.  If a judge is on the scene, and I'm familiar with that judge, yes.

Doc. 79 at 63:6–20.

Assuming this intervening revelation of the Judge Williams order worked to undue the initial probable cause for the arrest, the inventory search—which was conducted pursuant to a then-sufficient-probable-cause-based arrest and procedure—yielded new grounds to support probable cause for arrest before the order was discovered.

"'Probable cause is not a high bar.'" *Harris v. Hixon*, 102 F.4th 1120, 1125–26 (11th Cir. 2024) (quoting *D.C. v. Wesby*, 583 U.S. 48, 57, 138 S.Ct. 577, 199 L.Ed.2d 453 (2018) and citing *Kaley v. United States*, 571 U.S. 320, 338, 134 S.Ct. 1090, 188 L.Ed.2d 46 (2014) and *Davis v. City of Apopka*, 78 F.4th 1326, 1334 (2023)). "[P]robable cause does not require proof beyond a reasonable doubt or even proof by a preponderance of the evidence that the person arrested for a crime is guilty. *Id*. at 1126 (citing *Davis,* 78 F.4th at 1334).

> Instead, probable cause exists if the totality of the circumstances could persuade a reasonable officer that there is a "substantial chance of criminal activity by the person who is arrested." *Id*. at 1334 (quotation marks omitted). "A substantial chance is all that is required, not an actual showing of such activity." *Id*. at 1335 (quotation marks omitted); *see also Washington* [*v. Howard*], 25 F.4th [891], 902 [11th Cir. 2022] (holding that the correct standard to evaluate whether an officer had probable cause to arrest a suspect is to "ask whether a reasonable officer could conclude that there was a substantial chance of criminal activity") (alteration adopted) (quotation marks omitted) (emphasis added).

*Id.*

Thus, the court's inquiry about the intervening discovery must focus on whether under the totality of the circumstances there is a "substantial chance of criminal activity by the person who is arrested." *Id*. Before they had the vacating order, law enforcement discovered four pill bottles containing an unknown substance mixed with shrapnel. While they did not know what exactly they had discovered, Foster believed it was illegal, and he

suspected it was some type of bomb or other explosive device. At that time, there was a

"substantial chance of criminal activity by the person who is arrested." *Id*.

Judge Carnes's recent discussion about the reasonableness of law enforcement

actions viewed under a Fourth Amendment lens (although in a different context) is

instructive here.

> None of us is perfect. "Because it is a document designed to govern imperfect
> people, the Constitution does not demand perfect trials." *United States v. Roy*,
> 855 F.3d 1133, 1135 (11th Cir. 2017). For the same reason, the Fourth
> Amendment does not require a perfect investigation before an arrest is made
> or a charge is brought. What it requires is a reasonable investigation within
> the bounds of what can be expected of imperfect people. As the text shows,
> the Constitution protects against "unreasonable searches and seizures," U.S.
> Const. amend. IV, not against imperfect searches and seizures. That is why
> we have stated that "[t]he touchstone of the Fourth Amendment is
> reasonableness, and [why] we have stressed that in assessing whether officers
> acted reasonably it's not our role to armchair quarterback the officers'
> decision." *Davis v. City of Apopka*, 78 F.4th 1326, 1337 (11th Cir. 2023)
> (citations and quotation marks omitted).

*Harris*, 102 F.4th at 1125–26; *see also United States v. Gonzalez*, No. 23-10578, ---- F.4th

----, 2024 WL 3464023, at *5 (11th Cir. July 19, 2024) ("The Supreme Court has long

explained that the reasonableness of an arrest turns on probable cause, which involves a

totality-of-the-circumstances inquiry that favors fluidity rather than categorical buckets.")

(citation omitted). Given these circumstances, belief in criminal activity based on the pill

bottles was not unreasonable, even though it was not the motivating factor at the time of

the arrest. *See* Doc. 79 64:5–8. The undersigned finds that this discovery supported

Defendant's probable cause arrest even though the arrest warrant was not issued on this

ground and the warrant was singularly focused on the erroneous PFA violation. *See*

*Manners v. Cannella*, 891 F.3d 959, 969 (11th Cir. 2018) ("Probable cause for an arrest

may be found if there is probable cause to believe any crime was committed, whether or not there is probable cause for the crime the arresting officer actually believed had been committed."); *Lee v. Ferraro*, 284 F.3d 1188, 1195–96 (11th Cir. 2002) *overruled in part on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009) ("Quite simply, '[t]he validity of an arrest does not turn on the offense announced by the officer at the time of the arrest.'") (quoting *Bailey v. Bd. of Cnty. Comm'rs of Alachua Cnty. Fla.*, 956 F.2d 1112, 119 n.4 (11th Cir. 1992) (holding that arrest was proper based on bribery, unlawful compensation, and unlawful possession of money in jail even though arrest report reflected only conveying tools into jail to aid escape, for which defendant was not charged) (citing *United States v. Saunders*, 476 F.2d 5, 7 (5th Cir. 1973)[6] ("[w]hen an officer makes an arrest, which is properly supported by probable cause to arrest for a certain offense, neither his subjective reliance on an offense for which no probable cause exists nor his verbal announcement of the wrong offense vitiates the arrest"; holding that arrest was valid based on marijuana possession even though agents making arrest relied only on charges of harboring and concealing a fugitive, for which there was no probable cause) (citations omitted))).

### D. Statement Without Miranda Warning

There is no dispute that Defendant was not given his full *Miranda* warning at the time of his arrest. Doc. 79 at 45:24–47:7. Similarly, there is no dispute that Defendant was

---

[6] This decision of the Fifth Circuit issued before the Eleventh Circuit split is binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc) (adopting as binding precedent all decisions of the former Fifth Circuit issued through September 30, 1981).

not given a *Miranda* warning before Deputy Campbell questioned him at the Montgomery County Detention Facility. Doc. 80 at 30:6–23; *see also* Doc. 79 at 94:3–8. The question here is whether Deputy Campbell's questioning was a custodial interrogation first requiring a *Miranda* warning. *Garcia v. Singletary*, 13 F.3d 1487, 1489 (11th Cir. 1994) (quoting *Miranda v. Arizona*, 384 U.S. 436 (1966)). The undersigned finds Defendant was in custody and this was a custodial interrogation.

The Government relies on *Garcia*, 13 F.3d 1487, to argue Defendant was not in custody and no *Miranda* was needed. In *Garcia*, the Eleventh Circuit held that "'[g]eneral on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process,' do not require *Miranda* warnings" and "'[o]n-the-scene questioning' may take place in a prison environment as well as in public." *Garcia*, 13 F.3d at 1491 (citations omitted). There, the defendant inmate started a fire in his cell and a correctional officer asked him why he started it. The *Garcia* court held that "[f]or *Miranda* purposes, custody does not exist unless a public official questions the defendant 'in a context where [the defendant's] freedom to depart [is] restricted . . . .'" *Id.* at 1492 (citations omitted). For a defendant to succeed on his *Miranda* claim, he "must show that [the officer's] actions in some manner place[d] further limitations on' him." *Id.* (citation omitted). The court found that the defendant did not encounter more than usual restraint on a prisoner's freedom of action because the officer "did not isolate, intimidate, coerce, or otherwise pressure [the defendant] into making a statement." *Id.* Additionally, the court reasoned that, "[b]ecause [the defendant] was the only person in the cell during the fire and failing to remove him would have endangered his safety," the officer added no further

restraint. *Id*. Finally, the court found that removing the defendant from his cell provided him with "greater freedom of movement and significantly reduced those preexisting restrictions." *Id*. (citing *United States v. Cooper*, 800 F.2d 412, 414 (4th Cir. 1986) (holding the defendants were not in custody under *Miranda* because the defendants were taken to a conference area with open doors not for the purpose of interrogation but primarily for the purpose of conversing with a correctional treatment specialist at the defendants' request)).

Once again, courts look to "the totality of the circumstances and ask whether a reasonable man in [the defendant's] position would feel a restraint on his freedom of movement to such extent that he would not feel free to leave" to determine whether a defendant was "in custody" during an interview. *United States v. Deason*, 965 F.3d 1252, 1259 (11th Cir. 2020) (finding no custody where officers approached the house with guns in a protective posture but holstered them after arrival and did not draw them again and told defendant he was not in custody, not detained, and free to leave at any point during interview). "And under the test, 'the reasonable person from whose perspective "custody" is defined is a reasonable innocent person.'" *Id*. (citation omitted). "A defendant is in custody for the purposes of *Miranda* when there has been a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *United States v. Brown*, 441 F.3d 1330, 1347 (11th Cir. 2006) (internal quotation marks and citation omitted).

Here, Defendant was not in custody as a sentenced inmate; he was restrained as a pretrial detainee at the jail. He was detained pursuant to his arrest just hours earlier for violating the order of protection from abuse—an order he knew had been vacated. Unlike

an inmate who is sentenced to a period of incarceration and thereby lives his normal life *in a prison*, a pretrial detainee has a potentially temporary custodial status. *See Howes v. Fields and Maryland v. Shatzer*, 565 U.S. 499, 511–12 (2012) (noting the difference between "a prisoner" and "a person who has not been convicted and sentenced"; "service of a term of imprisonment" is not per se "in custody" for purposes of *Miranda;* "a prisoner, unlike a person who has not been sentenced to a term of incarceration, is unlikely to be lured into speaking by a longing for prompt release")*.* The "additional" restraint *Garcia* examined—a restraint beyond the inmate's day-to-day normal life in prisoner status—is not the same for a pretrial detainee in a circumstance like this one where the period of detention has essentially just begun, the period is indeterminate, and the circumstances suggest a reason a defendant could be eager to cooperate: he believes in his innocence. *See Howes*, 565 U.S. at 511 ("A person who is 'cut off from his normal life and companions,' . . . and abruptly transported from the street into a 'police-dominated atmosphere,' . . . may feel coerced into answering questions.") (citations and quotations omitted). Defendant responded to Deputy Campbell's directive that he come out of the cell to talk with him, and there was no indication he had a choice in the matter even though the conversation was held in the open area between his cell and the intake desk. A reasonable person, who was just arrested under these circumstances, is now in custody, and cannot freely leave the jail, would likely believe they had to obey the officer's command to come out of the cell to talk to the officer, just as Defendant did here. Defendant answered the deputy's questions about the contents of the pill bottles. Defendant was not being questioned about an on-going crime, and he was not being questioned on-the-scene about a crime in progress at the jail.

He was being questioned about matters separate from what he understood as the grounds for his arrest and not related to anything ongoing at the jail. When Deputy Campbell walked away, Defendant returned to the cell where he was being detained.

These facts distinguish these circumstances from those in which an inmate who is living day-to-day in prison is questioned about events around him. *See Garcia*, 13 F.3d at 1491–92. Thus, the totality of these circumstances require a finding that while being held on arrest pursuant to the PFA, Defendant (but for the exception noted below) was entitled to the *Miranda* safeguards for a custodial interview when he was questioned about the pill bottles that were then the subject of law enforcement's concern. *See Mathis v. United States*, 391 U.S. 1, 4–5 (1968) (defendant entitled to Miranda warning when he was questioned in state jail by a different law enforcement agency while being held on different charges brought by other law enforcement); *United States v. Green*, No. 3:22-CR-14 (MTT), 2023 WL 4374398, at *6 (M.D. Ga. July 6, 2023)[7] (holding defendant in custody for purposes of Miranda when interviewed; "Green was being held in Cobb County Jail after being arrested on an unrelated charge—he had not been convicted of that crime. Thus, his 'familiar surroundings' were still the 'outside world,' not a jail or prison. . . . [T]he totality of the circumstances of the interview strongly support the Court's finding that a reasonable innocent person in Green's position would have felt a restraint on his freedom of movement to such extent that he would not' have felt 'free to leave.'") (quoting *Howes*, 565 U.S. at 511; *Deason*, 965 F.3d at 1259).

---

[7] While not binding authority, the Court finds this and the other nonbinding decisions cited here persuasive.

While the undersigned finds that Defendant was in custody and was subject to interrogation by Deputy Campbell, which would ordinarily trigger a *Miranda* warning, these circumstances warrant application of an exception. In *New York v. Quarles*, 467 U.S. 649 (1984), the Court relied on the inherent flexibility in *Miranda* to carve out a public safety exception to its bright-line rule. *Id*. at 652. There the Court held that the police lawfully questioned Quarles without first giving *Miranda* warnings under a "public safety" exception. The police asked Quarles, a cornered suspect, where he had ditched the gun, and he gestured and responded, "The gun is over there." The police found a loaded revolver in the location he gestured. The Court found the cost of Quarles's silence in this situation "would have been something more than merely the failure to obtain evidence useful in convicting Quarles." *Id*. at 657. "[T]he need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." *Id*. In such a circumstance, police are acting to neutralize the hazard. *Id*.

The Government argues, and the undersigned agrees, that these circumstances fall within the public safety exception. The "public safety exception allows officers to question a suspect without first Mirandizing him when necessary to protect either themselves or the general public[.]" *United States v. McGhee*, No. 2:22-CR-65-RAH-CWB, 2023 WL 3945576, at *7 (M.D. Ala. Feb. 22, 2023), *report and recommendation adopted*, No. 2:22-CR-65-RAH, 2023 WL 3319364 (M.D. Ala. May 9, 2023) (citing *United States v. Newsome,* 475 F.3d 1221, 1224–25 (11th Cir. 2007) (exception applied due to the officers' reasonable belief that they were in danger due to the suspected presence of another

individual inside the room); *United States v. Spoerke*, 568 F.3d 1236 (11th Cir. 2009) (exception applied where suspected pipe bomb inside a vehicle posed threat to the public on city street); *United States v. Smith*, 322 F. App'x 876 (11th Cir. 2009) (exception applied where arresting officer asked if defendant was in possession of any weapons); *United States v. Freeman*, 591 F. App'x 855 (11th Cir. 2014) (same); *United States v. Williams*, 784 F. App'x 707 (11th Cir. 2019) (exception applied where arresting officer asked where a firearm was located when multiple individuals, including children and other officers, were present); *United States v. Jones*, 798 F. App'x 434 (11th Cir. 2020) (exception applied where arresting officer asked the defendant where a firearm was located when responding to a domestic disturbance with shots fired); *United States v. Jefferson*, No. 2:07-CR-311-WKW, 2008 WL 1848798 (M.D. Ala. Apr. 24, 2008) (exception applied where officer asked the defendant if gun was loaded following arrest)).

Defendant argues that this situation does not warrant application of the exception because law enforcement did not act immediately and did not act for the safety of the general public. The undersigned finds that law enforcement's delay in acting on the safety concern does not negate application of the exception under these circumstances. A reasonable officer should have acted sooner upon concern of the presence of a bomb—upon first discovery of the pill bottles. Indeed, Foster acknowledged that he made a mistake in not doing so. Even so, law enforcement acted at the time of Deputy Campbell's questioning, even if tardy, based on a reasonable and genuine public safety concern. Once the items had been transported inside the Sheriff's Office and they could be seen more clearly, the safety issue became obvious and urgent to Foster, and addressing that safety

issue was then directed with haste by Lieutenant Davis. Then, law enforcement went into urgent action to find out the contents of the four pill bottles to address the associated safety risk to those in the office where the items had been brought, to those responsible for handling the bottles, and to those who were in the vicinity. *See* Doc. 79 at 94:3–8; 118:6–120:6; 121:1–5; Doc. 80 29:24–30:25; 36:8–20. Viewing these circumstances through an objective lens, as the Court must,[8] Campbell's actions were designed to discern the safety threat the pill bottles presented to the officers and the other individuals nearby in order to take further action to protect against that threat. Much like a concern undergirding law enforcement action to ferret out the presence of a firearm, assessing the contents of a suspected bomb or other explosive device warrants application of the public safety exception to allow law enforcement to elicit information to neutralize a risk of harm. The exception applies here and the statement should not be suppressed on the basis that it was given without a *Miranda* warning.[9]

## III.   CONCLUSION

For the reasons stated above, it is the RECOMMENDATION of the Magistrate Judge that Defendant's Motion to Suppress (Doc. 40) be DENIED.

---

[8] To the extent Defendant relies on Campbell's reaction to Defendant's statements—stating that mixing Tannerite in that manner was a "big federal charge"—to argue that a safety concern was not his motive for questioning Defendant, the officer's subjective motivations are not to be considered. *Williams*, 784 F. App'x at 710 ("[T]he Supreme Court has made clear that the subjective motives of the officers are not to be considered in determining the applicability of the public safety exception to a certain set of facts, but rather the inquiry is an objective one.").

[9] Defendant argues that a later, *Mirandized* statement he gave to ATF is the fruit of the poisonous tree and should be suppressed. Based on the undersigned's findings warranting recommendation that the motion to suppress be denied as to each challenge, there is no fruit-of-a-poisonous-tree-theory applicable.

It is further ORDERED that by **August 15, 2024**, the parties may file written objections to this Recommendation.

An objecting party must identify the specific portion of the factual findings or legal conclusions to which the objection is made and must describe in detail the basis for the objection. Frivolous, conclusive, or general objections will not be considered. The Recommendation is not a final order and, therefore, is not appealable.

Failure to file written objections to the Magistrate Judge's findings and recommendations in accordance with 28 U.S.C. § 636(b)(1) will bar a party from a de novo determination by the District Court of legal and factual issues covered in the Recommendation and waive the right of the party to challenge on appeal the District Court's order based on unobjected-to factual and legal conclusions accepted or adopted by the District Court except on grounds of plain error or manifest injustice. *See* 11th Cir. R. 3-1.

DONE this 1st day of August, 2024.

/s/ Kelly Fitzgerald Pate
KELLY FITZGERALD PATE
UNITED STATES MAGISTRATE JUDGE